Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is No. 23-1932, United States v. Moreno-Vizcaino-Peguero. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin? Good morning, Your Honors, I'm AFPD Jackson Wetzel, arguing on behalf of defendant appellant Mr. Vizcaino-Peguero. If I may, could I please reserve three minutes for rebuttal? Yes. May it please the Court, 18 U.S.C. 922 G5A is unconstitutional as applied to Mr. Vizcaino because he is protected by the Second Amendment through his substantial connections to the national community, the statute prohibits the protected conduct of mere possession of a firearm, and the government failed to carry its burden of offering sufficient analogs at the district court level. Further, the Court below erred by basing its opinion on untrustworthiness and non-membership in the political community after having assumed his membership in the people at an earlier step in the Bruin analysis. For all of these reasons, we are asking this Court to dismiss the indictment against Mr. Vizcaino or remand to the district court with instructions to do so. As we have briefed, we are asking this Court to truly engage in the Bruin analysis. As we see it, Bruin tells us to look, in step one, at the conduct. It is a conduct-centric or solely conduct analysis at step one. As Heller told us, to keep and to bear is essentially to possess and to carry. Possession is the core conduct being protected by the Second Amendment. The conduct being prohibited by 922G5 is just that, possession of a firearm, and for that reason this Court should then go on to the second step of the analysis, which is a historical analysis wherein the government carries the burden to prove that it is consistent with the history and tradition of our nation to disarm people in the same fashion. They simply cannot carry their burden because there have not been complete and categorical bans of the nature that 922G5 is. Could you shift your argument to just address who you see the people refers to? I think we have sort of competing statements in Heller and then in Verdugo. Yes, so clearly we read the people as a more inclusive term clearly than citizen in the Constitution. Heller does talk about the Second Amendment right belonging to all Americans, and it does use the term members of the political community. In so doing, it cites directly to Verdugo-Urquidez, and Verdugo-Urquidez talks about substantial connections to the national community. So that is the test, I guess you would say, for membership within the people that we are asserting is the appropriate one, substantial connections to the national community. That definition sort of trumps the more narrow political. It does, but the political community language in Heller is, again, in so stating it directly cited to Verdugo-Urquidez, so political community and national community is kind of the only difference there. But Heller did, too, I think it's very important to note that Heller drew a stark distinction between the prefatory clause of the Second Amendment, which made note of the militia, and the operative clause, which was the people, drew a distinction there and said that the people was much more inclusive than the militia, and noted that how the militia was limited by things like age and gender and things like that, and the people was more broad than that. Let's say that a non-citizen's substantial ties to the United States through physical presence and the like can bring you within the people just like it arguably could under the Fourth Amendment. Correct. Then there's still the question of whether the person's ongoing unlawful presence constitutes a condition that is permissibly a condition that can be relied on to prevent them from having the weapon. What's a reason to think that ongoing unlawful presence isn't a reason to think that Congress is within its rights to restrict a person with such ties from having it? In other words, a person with the absence of such ties, it may be outside, a person with those ties who doesn't have a continuing unlawful presence, let's say they entered the country unlawfully, but now as an asylee, they may be in a different position, but as I understand it here, the way the case is coming to us, the defendant has a continuing unlawful presence at the time of the possession. Isn't that how we have to assume the case is presented to us? Yes, this case is broader than 922G5A, that is correct, but again... When you say it's broader than 922G5A... That it's unlawful presence, but it is not impossible for somebody who enters illegally to then become present legally. And are they still captured by the statute? That has not been directly addressed yet. Okay, so the challenge, at least as it's coming to us, is a person who doesn't have a lawful presence at the time of the possession. Correct. And so what's wrong with concluding that condition of having an unlawful presence at the time is a condition that's permissibly within Congress' judgment that that's a good reason to, a legitimate reason to disable them from having a firearm? So it doesn't rise to the level of danger. If we're just looking at the legalities... There's no case law that says only criterion that Congress can rely upon is danger. No, but I think the Rahimi opinion shows that that's where the Supreme Court is honing in on. Well, that shows that they have identified that as a principle for justification of it, and then, you know, I guess I'm still just stuck with the idea that this is a person who is unlawfully present in the country and continues to be, and I guess, what is the basis for suggesting that that's a problem? You just took even the language from Heller of law-abiding. I understand the idea that a felony doesn't make you, but you're not continuing, if you're still committing the felony, certainly 924C is permissible, right? If you're using the firearm while engaged in the felonious conduct. So this would be, while you're unlawfully present in the country, you can't have a gun. And there wouldn't be that nexus again. And the possession is solely for self-protection, not to allow him to continue remaining in the country. So there's not a nexus of the firearm possession to the crime. True, but what shows that that's a requisite when the person's quality is that they are unlawfully present in the country? Our position here is that full citizenship is not necessary for protection. I'm not suggesting full citizenship is. The LPRs might be able to, even undocumented persons who are asylees might be able to. But a person who's got no lawful status in the United States, what's the reason for concluding that? Again, the substantial connections and participation in the community. That makes them the people, but not every person who is within the people has a right unlimited to have the gun. They can have a condition or a quality about them that justifies the firearms regulations. I understand that Congress' judgment was the unlawful presence of the person is that condition. Why is that wrong? Because, so again, just being present unlawfully doesn't remove one from the community. So it can be a member of the people. Not saying that. And then there's nothing that he was doing while he was here that would have removed him from that. Correct. That just shows he's in the people. It doesn't show he has the right to possess it. Not everybody who is in the people, just by virtue of being in the people, has an unlimited right to possess a handgun. That's Rahimi, that's Heller, that's Brewett, all of those make that clear. So then the question is, is there a condition this person has that justifies the regulation of him having a handgun? Congress' judgment is that condition is having an unlawful presence in the United States. A lot of the cases that are decided that way, Your Honor, the second, the ninth, the tenth, they have assumed non-citizens, undocumented persons have membership within the people. And then they looked at this and said, but at a rational basis level, it means in scrutiny, they looked at it and said, but Congress can still do this because generally speaking these would be the types of the persons that would avoid law enforcement and so on and so forth. Two responses to that. That's just not the case. This Court can't analyze it that way because Brewin aggregated means in scrutiny. But the 11th Circuit came to that same conclusion, as I read it, without getting to that type of analysis, because they all did it pre-Brewin, under the two-step analysis that Brewin rejected, but it did it all at step one of that two-step analysis, which is effectively just the history and tradition analysis that Brewin now mandates. So the 11th Circuit did it exactly this way, while concluding the person, assuming the person was within the people. Yes, but Shiloh Jimenez did say, conclude that it was a citizens-only right, and I don't think that that can be. Heller, inciting to Verdugo-Hercules, talks about the people that's mentioned in the 13th  It didn't say citizens-only because it had a footnote saying that LPRs might be different. Okay. But it did separate the Second Amendment from others. And just under the rules of legal construction, the people should be analyzed as having the same meaning in each amendment, the first, the second, the fourth, and the ninth, and the tenth. And so, for that reason, along that line, since we are talking about membership within the people, if I could address, essentially what we're asking the court to do is engage in a full historical and textual interpretation of the Second Amendment, specifically in the 922G5, for the first time since Brewin. In responding to the Government's 28J that was filed recently, you know, they talk about the Fifth Circuit's opinion in Medina-Cantu. Medina-Cantu basically just upholds Portillo-Muñiz, which was pre-Brewin precedent, saying that undocumented persons did not belong in the people. At the end of that opinion, though, at the end of Medina-Cantu, the Fifth Circuit acknowledges that after Rahimi, they very well may have reviewed Portillo-Muñiz different. The only reason they didn't, it wasn't really a true Brewin analysis. The only thing before the court was whether or not Portillo-Muñiz was unequivocally irreconcilable with Brewin. They decided no, but they said there were reasons they may revisit it, especially considering with what the Rahimi court did with the law-abiding responsible citizen terminology. And they also acknowledge that Portillo-Muñiz never engaged in a historical textual analysis of the Second Amendment. Looking at the Eighth Circuit, the Citladin case, that's exactly what they did as well in Flores. They simply said, we're not going to engage in an analysis, we're going to say Flores is not unequivocally irreconcilable, and we go with that interpretation, although Flores may be incorrect. And when you go look at that Flores case, it is absent of any textual interpretation, Your Honor. It's a four-sentence case, the three sentences recapitulate procedural history, and the fourth simply points to the Fifth Circuit and says, we agree with Portillo-Muñiz, and that's absent any historical. Just in the Eleventh Circuit's case, the Eleventh Circuit's analysis is based on history. The Eleventh Circuit goes through the history of disabling aliens from having it in English history and prehistory and then peaceable citizens, et cetera, and why isn't, and its conclusion was that even if lawful permanent residents might have the right notwithstanding that, even assuming that an undocumented person here has sufficient ties that brings them within the people, that historical pedigree suffices to justify prohibiting possession of a gun by a person who has a continuing unlawful presence. I see I'm out of time. I would love to respond to that if I could. You could, yeah. So I believe him and his shadow was maybe a month before Boone came down, but so looking at what has been proffered and looking at those, the main analogs that were proffered there were Native American disarmament, Catholic prohibition, and Loyalist prohibition. And aliens. And aliens. In the Eleventh Circuit, they go through a substantial amount of historical precedent for restricting alien possession of weapons. I think it comes from those specific analogs. I'll just say that the Heller Court cited the Blackstone. Blackstone said that aliens, denizens, and natural born subjects were all included within the people. That would be my response to why Mr. Vizcaino can still be in the people under the Second Amendment. And I will come back on rebuttal. Thank you. Thank you, Counsel. At this time, would Counsel for the United States please introduce himself on the record to begin? May it please the Court, William Glasser for the United States. To uphold Section 922G5A, this Court only needs to answer a fairly narrow set of questions and, in fact, can resolve this case either one of two ways. This Court could agree with the pre-Bruin cases who have concluded that unlawful aliens are outside of the people protected by the Second Amendment, or this Court could agree with the Eleventh Circuit's pre-Bruin decision concluding that even if illegal aliens are within the people, there is still a historical justification for prohibiting their firearm possession. Either of those two ways is sufficient to uphold Section 922G5A, and this Court doesn't need to decide some more complicated questions about whether those who might be present lawfully in the country but not yet citizens are protected under the Second Amendment. If I can turn first to the argument that illegal aliens are not part of the people, throughout the Supreme Court's decisions in Heller, Bruin, and Rahimi, the Court has referred to it as a right of citizens. Now, it's true that the Second Amendment does not actually use the term citizen but uses the term the people. But as we've explained, understood in its historical context, the people within the Second Amendment has a narrower meaning that is limited to those who are citizens of the country. And that just means that Verdugo-Urquidez is wrong when it said the Second Amendment is, in defining it, people within the political community plus people with sufficient ties to the national community. It doesn't tie it to citizenship. So, Your Honor, Verdugo-Urquidez was addressing a question under the Fourth Amendment about whether aliens outside the country possessed Fourth Amendment rights. And in the course of that, they said the first, second, and fourth all mean by people, I thought. People who are within the political community or people who have sufficient ties to be within the national community and didn't tie it to citizenship. That's correct. That's correct, Your Honor. That's what the Court said. But that was dicta. And in fact... And the fact that Heller just repeats that exact dicta in describing the people we should just ignore? No, I don't think this Court should ignore it, no, Your Honor. But I think it's... Is dicta now in Heller also? Well, Your Honor, Heller used a narrower term. As the opposing counsel discussed, Heller referred not just to the national community but to the political community and then repeatedly used the term citizen. It referred to the political community in describing the other amendments that use the people.  So... But in terms... And it did it for purposes of trying to refute the dissent's contention that the right under the Second Amendment was a collective rather than an individual right. That... And it was trying to say that even in the cases in which they talk about it as a political community, it was an individual rather than a collective right. Yes, Your Honor. They were not suggesting, as I read it, that the Second Amendment's use of the people was limited to people in the political community. Well, Your Honor, I think that that's a reasonable reading of Heller. But regardless, I think it's clear that neither Verdugo or Quidez nor Heller definitively resolved who fall within the people. And Verdugo or Quidez was really just saying in dicta, he used the word suggests, it said that our analysis suggests that the people refers to a class of persons who are part of the national community or who have sufficient connection to the country. So Verdugo or Quidez doesn't resolve this case in defendant's favor. No, we're not contending that Verdugo or Quidez and Heller resolve it. Well, the only way we can avoid it and decide it's not within the persons is doing that inquiry, unless we go to your second argument, which is that we assume he's within the class of people who are the people, and then we look at whether it nonetheless can be restricted. Exactly, Your Honor. And we're happy for a decision that goes either way. But what would be the basis for avoiding that by saying he's not within the people? I'm sorry, Your Honor. Oh. You were suggesting we could avoid that inquiry by saying we could conclude here this person is not within the people. The only way to do that would be, I think, to read something into Heller that would read out its extended quotation from Verdugo or Quidez. No, Your Honor. I don't think it would require reading out the quotation from Verdugo or Quidez. And the reason is that Verdugo or Quidez wasn't resolving definitively the issue of whether aliens, illegal aliens within the country fell under the Fourth Amendment. And so... Is there anything in Heller that resolves that? No, Your Honor. Heller doesn't resolve it. So I guess I'm just not understanding. So, Your Honor, Heller repeatedly describes the right as belonging to citizens. And it quotes that language from Urquidez that suggests the people includes people with sufficient ties to the nationalist community. Yes, Your Honor. So Heller doesn't tell us yes or no as to whether illegal aliens are in that group. I agree with that, Your Honor. Heller does not resolve this case definitively in our favor. So what does that would support us concluding he's not within the people? Sure. So as we explain within our brief, Your Honor, we cite the cases from the Fifth and the Eighth Circuits that have reached the conclusion that the meaning of the Second Amendment, the people within the Second Amendment, doesn't have to be identical to the meaning within the Fourth Amendment. And that's what I'm saying. That's just to read out Heller's reliance on the language from Verdugo or Quidez about the Fourth, Second, and First Amendments. Right. Well, Your Honor, we think that the issue was not resolved against us and that understood in their historical context, the Second and the Fourth Amendments can mean different things. Even the words the people can mean different things in those two amendments because of the historical context. And this is where... So just wait. I'm just... Sure. So the use of the people in the Second and the Fourth, your position is that refers to different groups of people? Your Honor, we haven't actually taken a firm position because the Supreme Court hasn't taken a firm position on the meaning of the people as applied to illegal aliens under the Fourth Amendment, but they need not. Our view is that they need not mean the same thing. So this court can rule in our favor under the Second Amendment without resolving any Fourth Amendment questions. And that's exactly what the Fifth Circuit said in the Portillo-Munaz case when... And to do that, all I'm saying is we'd have to just ignore that language in Heller that quotes Verdugo or Quidez, which you're admitting might mean an illegal alien is within the people. Sure. Your Honor, we don't think you would have to ignore that. Just... Did we read it, give it attention, and then ignore it? No, your Honor. So the Fifth Circuit read that part of Heller and said it doesn't definitively resolve the issue and then resolve the issue in our favor, concluding that illegal aliens are outside of the people. And we think that there are good historical reasons for reaching that conclusion. But that same history... So the same history I think that supports our reading of the people also supports what I think this Court might find the easier path to take, which is the Eleventh Circuit's path, and to conclude that regardless of whether they are part of the people, they can... Illegal aliens can be disarmed consistent with the Second Amendment. So we're perfectly happy for the Court to take that approach as well. But we think that the same history that shows that traditionally illegal aliens or those who are not part of the national political community could be disarmed also supports the conclusion that the people in the Second Amendment excludes them. So I think in this context, the textual and historical analyses are not... Can't be artificially divorced necessarily, but even if this Court just looks solely to history and doesn't resolve anything at the textual step, Section 922G5A is constitutional. And if I can briefly just walk through the reasons that the Eleventh Circuit is correct. I don't think that Defense Counsel has been able to point to many criticisms of the Eleventh Circuit's analysis other than the fact that the laws that were enacted prior to the founding did not specifically target illegal aliens with disarmament. That is, taking away their firearms on the basis that they were illegal aliens. However, the laws that we've cited in our brief, including the laws prohibiting firearm sales to Native Americans and those disarming loyalists, did disarm people who fell outside the national political community on the basis that in the case of loyalists, they refused to swear allegiance to the colonies or the new United States of America. That certainly, it's not identical to Section 922G5A, but the Supreme Court has made clear... Well, is it the case that everybody with an unlawful presence here has refused to swear loyalty? No, Your Honor. It's not identical. Why is that a good twin? Your Honor, first of all, the Supreme Court has repeatedly said we don't need a twin. Why is it a good cousin? Your Honor, it's a good cousin because it disarmed them based on the fact that they, by not showing loyalty to the United States... What indicates that a person who is here with an unlawful entry... Oh, I'm sorry. ...is trying to get a lawful presence in the United States is disloyal to the United States? Your Honor, their presence in the United States is itself in violation of United States law and an unwillingness to comply with United States immigration law. Many of these people are trying to now demonstrate their loyalty. If you would give them citizenship, they'd take it. Sure. I understand, Your Honor. But that's very different than a loyalist who will not, even if asked, swear allegiance to the colonies. Your Honor, I mean, it's different. I'm not denying that there is... It is in a pretty relevant sense, which is one suggests loyalty to the country and the other suggests disloyalty to the country. But Your Honor, the broader principle that one can extract from the loyalist laws, the laws prohibiting sales to Native Americans, and then the other history, for example, Blackstone and the Second Amendment precursors, all suggest that it's not merely someone who is unwilling to swear allegiance to the government that can be disarmed, but someone who is an alien and who is not part of the political community. So in order to accept the defendant's argument, someone could come into the country with an intent to commit crimes against the United States, and they would still, by virtue of having been in the United States long enough, crimes beyond illegal immigration status. If I understood the argument, the argument was that might be a very different case because of the nexus between the conduct, having an intent to commit future crimes, and seeking the firearm. Sure. I think the idea here is there is no nexus of that sort. All you have is the unlawful presence, and so what historically supports that idea? Before you answer that, what do we make of the language of law abiding in Heller after Bruin? So, Your Honor, I think after Rahimi, the United States is not relying on the words law abiding sort of on their own, because Rahimi, so in Rahimi, we argued to the Supreme Court that responsible and law abiding were limitations on the right. Rahimi rejected our reliance on responsible, didn't say anything about law abiding. What about law abiding? And the reason I ask is you could imagine that that language wouldn't suggest anybody who has committed a legal infraction at any time, that doesn't render you not law abiding. Right. But a person who has a continuing unlawful presence, it wouldn't be a stretch of language to suggest that person is not presently law abiding. I completely agree, Your Honor. But where are we after, I mean, there is that language in Heller, and then we have Bruin, which is dealing with a slightly different question, as is Rahimi, and so I guess I'm just sort of not sure what to make of whether Congress is disabled from determining that a person who is continually unlawfully present in the country is not law abiding, and therefore under Heller isn't presumptively protected, so that we don't even have to do this whole historical exegesis. Your Honor, I'm afraid, in our view, you can't get away from the historical inquiry altogether, and the reason is, unless, of course, you accept our first argument about the people, but the reason we don't think that after Rahimi it is appropriate to rely solely on the use of law abiding or responsible, either of them, in the Court's prior opinions, solely. Just the use of those terms doesn't decide the issue, but we do think that the Court can look at history and conclude, we think the history amply supports the view that those who are not law abiding, if by law abiding we mean someone who has committed a serious crime. What's the history of restricting aliens, in light of the passage that your opponent quoted from Heller about denizens, aliens, blah, blah, blah, are all included? So Your Honor, it's true, I think it was quoting from William Blackstone, it's true that William Blackstone said that the people can include denizens, aliens, and subjects, however, elsewhere in his commentaries, Blackstone says that the right to bear arms is something that is possessed only by subjects, and that's borne out not just by Blackstone, but by the English Bill of Rights, which specifically says that the right is possessed by subjects, and the Supreme Court in Heller made clear that the English Bill of Rights was the basis for the Second Amendment. Not identical, certainly, but that principle, that those, only those... Was there a history in the United States of actual firearm regulation prohibiting aliens from having them? Not in so many words, Your Honor, the only examples were those that I cited earlier, the laws prohibiting sales to Native Americans, and those disarming loyalists. And in fact, the tradition was that aliens were entitled to have them? Your Honor, I think if you've, yeah, I believe if you were an alien who was within the United States, you didn't fall within one of those groups, ordinarily you could, I don't think that there were laws specifically disarming them, however, that was never how the right was understood. Bruin test is that in the absence of laws prohibiting it, we're supposed to assume the right protects it. No, Your Honor, I don't think that's a fair reading of Bruin. Bruin did say that the absence of laws prohibiting something was relevant evidence, but Bruin did not suggest that just because founding era legislatures failed to regulate something meant that it was therefore protected. I think if you look at Justice Barrett's and Justice Sotomayor's concurrences in Raheny, they make that point very clearly and persuasively. And so what would be the other evidence? That's the Blackstone Commentary? Yes. Or the analogy to Native Americans and Loyalists? Yes, Your Honor, so we have, and I see my time's about to expire, but I'll, if I can answer briefly, so we have the laws disarming Native Americans, we have laws disarming Loyalists, we have the longstanding understanding of the... Just so I, last question for you, would you say that the Native Americans and Loyalist laws are a good analogy also for lawful permanent resident aliens? Not, Your Honor, I think the analogy might perhaps be weaker, but we don't need, this court doesn't need to decide that. I need to know what the rationale for why those are a good analogy to this circumstance. Sure. I don't know whether, if I accepted that rationale, I'd be deciding more than just this case. Sure, so Your Honor, just to be clear, the federal law does not prohibit lawful permanent residents from possessing firearms, but I think the analogy would perhaps be weaker, and the reason is that we still think that even lawful permanent residents don't fall within the people under our first argument. The analogy would perhaps be weaker, though, because those who are lawful permanent residents have received some sort of recognition by this country that they belong here, and they have actually taken all the legal steps necessary to pursue the path to citizenship. And that makes them a good analogy to... I'm sorry, so... A bad analogy to Native Americans and Loyalists? Your Honor, the analogy is not as strong, because Native Americans were those who clearly fell out, all the way outside the political community, and were not in the process of becoming part of the political community, and Loyalists who refused to take an oath of allegiance were not like those pursuing lawful permanent resident status. And so what about a person without present lawful status who is pursuing it? Without present lawful status who is pursuing it? Your Honor, we don't... Isn't that this defendant? Well, yes, Your Honor, it is. So what about that? Your Honor, we don't think that the Second Amendment right applies to someone who came to the country illegally, and although he's trying to get his unlawful status corrected, has not yet done so. Do you think we have an obligation to sort of peel back the analysis, so not stop at the level of unlawful person? So for instance, like, is it appropriate for us in this case to look and see who is this defendant, what has he been doing to make his status, you know, comport with the law? So Your Honor, I think ordinarily, when considering an as-applied constitutional challenge, it is appropriate to look at the circumstances of the person himself. We don't think that you need to do that. We don't think that... But if we are trying to dissect the historical analogs, we really have to, it seems like. I mean, it sort of seems like that's what you're saying. No, Your Honor, you don't need to go with that level of granularity. So for example, in the 11th Circuit Jimenez-Chalon case, the court didn't look at specific defendant specific facts in that case, but concluded that as a general matter, those who are in the country unlawfully can be disarmed consistent with the Second Amendment. And we think that that's all the court needs to do here. Thank you. Thank you. Thank you, counsel. Can I get a couple at a time, a couple of the faculty, faculty, and all of the... Thank you. I'm going to go to AFPD Jackson Wetzel for Mr. Vizcaíno-Peguero. May it please the court. To address the ongoing presence that seemed to be the court's main concern, I would just like to say that once... The point is that once coming across and being here, even if considered an ongoing... That a presence is an ongoing crime... It's not a crime. It's not... Yeah, it's not. But still, it's unlawful. Right. But it's not a crime. And he was otherwise doing the right things, otherwise existing legally, not breaking other laws. And he was doing the right thing in trying to become a citizen. We would point to... To gain some status, we point to the supplemental appendix, pages four into five, as well as page 93, where it talks about how he was working legally in the industries of painting, landscaping, construction, that he was paying taxes, filing local Puerto Rico taxes, that he was married to an LPR, that he had fathered two children who are American citizens. And above and beyond that, of course, he was trying to enter the process, which I would say is being part of the community and engaging in that process. In the supplemental appendix at nine, there's his marriage certificate, his petition at page 11, the approval notice at 17, the visa number was approved at 19, and he got a provisional waiver that's at page 25. So he was otherwise doing the right thing. And I bring that up because the Bonito court, I know that was out of the Fifth Circuit, but Bonito cites to a lot of stats that simply show that as a class, undocumented persons as a whole are not a danger. They're not here committing crimes, even not in comparison to the citizenry. So Mr. Vizcaíno did not have any control over the immigration process. And I think that's important because the Rahimi court told us that the temporariness of the prohibition was also very important. And in Rahimi, you were dealing with an order of protection that had a finite, on the face of the order, a finite term, which was two years. And in this situation, a person in Mr. Vizcaíno's position who comes over, is otherwise comporting with the laws, is entering the system, making himself aware to the authorities, filling out the paperwork, signing his name, giving his biometric data, is legally in existence otherwise here, not breaking the law actively. And so there's no finite term there. And I think that runs a little bit afoul to Rahimi, who thinks that it's important that they've made it clear they think the temporary nature of the restriction is important. Again, the Native American, the ban against colonists arming Native Americans fails both the how and why prong. It's not, it doesn't dispossess Native Americans, it bans colonists from arming Native Americans. The why is different. It's racial on the face of it to the extent. There's no history of firearms restriction in the country post-1789 of aliens? No, just not as a whole. Not as a whole. Is there any? None that you're aware of other than this? That's correct. Thank you. Thank you. That concludes argument in this case.